UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                                         | ) |                     |
|-----------------------------------------|---|---------------------|
| RAYMOND MERCEDES,                       | ) |                     |
|     Plaintiff,      | ) |                     |
| v.                                      | ) | No. 13-cv-12043-LTS |
| ERIC HOLDER, Attorney General,          | ) |                     |
| United States Department of Justice,    | ) |                     |
|     Defendant.      | ) |                     |

ORDER ON DEFENDANT'S MOTION FOR
JUDGMENT ON THE PLEADINGS (DOC. NO. 34)

July 1, 2014

SOROKIN, J.

Plaintiff Raymond Mercedes, a Black Hispanic male from the Dominican Republic, is an employee of the Federal Bureau of Prisons ("BOP") assigned to the Federal Medical Center Devens ("FMC Devens"). Mercedes has sued the United States Attorney General, claiming he was discriminated against at work on account of his race and nationality, and that he was subject to retaliation after complaining about such discrimination, all in violation of Title VII of the Civil Rights Act of 1964.[1] Doc. No. 1.[2] The Attorney General has moved for judgment on the pleadings. Doc. Nos. 34, 35. Mercedes has opposed the motion, Doc. Nos. 36, 37, and the Court

---

[1] Mercedes originally sued the Director of the BOP and the Warden at FMC Devens as well, but later dismissed them from the action. See Doc. No. 28.

[2] Citations are to documents that are part of the docket and viewable via the Court's electronic filing system. Where page numbers are cited, references are to the numbering placed at the top of each page by the electronic filing system.

heard oral argument on June 24, 2014, Doc. No. 42.[3]  For the reasons that follow, the Attorney General's motion is ALLOWED.

I.      LEGAL STANDARD

The legal principles guiding federal courts in resolving motions for judgment on the pleadings pursuant to Rule 12(c) and motions to dismiss under Rule 12(b)(6) are essentially the same.  Curran v. Cousins, 509 F.3d 36, 43-44 (1st Cir. 2007); Lexington Luminance LLC v. Amazon.com, Inc., No. 12-12216, 2014 WL 1092871, at *2 (D. Mass. Mar. 18, 2014).  Both types of motions call for "an assessment of the merits of the case at an embryonic stage," R.G. Fin. Corp. v. Vergara-Nunez, 446 F.3d 178, 182 (1st Cir. 2006), and require the Court to "view the facts contained in the pleadings in the light most favorable to the party opposing the motion – here, the plaintiff – and draw all reasonable inferences in the plaintiff's favor," Curran, 509 F.3d at 43; accord Lexington Luminance, 2014 WL 1092871, at *2.

The Court may consider documents beyond the pleadings if their authenticity is not disputed, they are central to the plaintiff's claims, or they are referred to in the complaint.  See Curran, 509 F.3d at 44 (quoting Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993)).  To survive either motion, the complaint "must contain factual allegations that 'raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true.'" Perez-Acevedo v. Rivero-Cubano, 520 F.3d 26, 29 (1st Cir. 2008) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  This standard, however, requires the plaintiff to offer "more than labels and conclusions," and more than "a formulaic recitation of the elements of a

---

[3]Although Mercedes was pro se when he filed his complaint, he now is represented by counsel, who responded to this motion on his behalf and appeared at the oral argument.

2

cause of action." Bell Atl. Corp., 550 U.S. at 555. The complaint "must provide fair notice to the defendants and state a facially plausible legal claim." Ocasio-Hernandez v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011).

A discrimination claim under Title VII can be based on allegations of discrete discriminatory acts or on treatment which constitutes a hostile work environment. To establish a prima facie case of discrimination arising from discrete acts, a plaintiff must allege membership in a protected class, that he performed his job at an adequate level, and that he suffered an adverse employment action. See Conward v. Cambridge Sch. Comm., 171 F.3d 12, 19 (1st Cir. 1999); Espinal v. Nat'l Grid NE Holdings 2, LLC, 794 F. Supp. 2d 285, 292 (D. Mass. 2011). "An adverse employment action is one that affects employment or alters the conditions of the workplace, and typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010) (internal quotation marks, alterations, and citations omitted). It "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002).

To state a hostile work environment claim, the plaintiff must allege objectively offensive discriminatory conduct so severe or pervasive that it unreasonably interfered with his working environment. Rosario v. Dep't of Army, 607 F.3d 241, 246 (1st Cir. 2010). Such "conduct must be extreme [enough] to amount to a change in the terms and conditions of employment." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998). Title VII is not "a general civility code for the American workplace." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80

3

(1998). It "does not prohibit all verbal or physical harassment in the workplace; it is directed only at 'discriminat[ion] . . .because of . . . [race, color, . . . or national origin].'" Id. (quoting 42 U.S.C. § 2000e-2(a)(1)).

A plaintiff claiming retaliation in violation of Title VII must allege that he "engaged in protected conduct," "was subject to an adverse employment action," and that "a causal connection existed" between his conduct and the action. Colon v. Tracey, 717 F.3d 43, 49 (1st Cir. 2013). For these purposes, a materially adverse employment action is something that likely would deter a reasonable worker from complaining of discrimination. Id.

## II. RELEVANT FACTS

In keeping with the principles set forth above, the following facts are taken from the complaint and the portions of the administrative record referenced therein and submitted by the parties.[4]

Mercedes has worked for the BOP for nearly twenty years. Doc. No. 1 at ¶ 41. He is a Senior Officer Specialist and has worked at FMC Devens for nearly nine years. Id. at ¶ 42; Doc. No. 35-1 at 1. During that time, Mercedes has filed multiple discrimination complaints with the Equal Employment Opportunity Commission ("EEOC"), including one related to the claims in this lawsuit. Doc. No. 1 at ¶¶ 8, 43-44.

In this action, Mercedes alleges discrimination based on race and national origin, as well as retaliation for his previous EEOC complaints. See id. at ¶¶ 25, 39, 50, 51. His claims arise from three categories of alleged events: 1) temporary shift reassignments; 2) denial of

---

[4]The parties agree that Mercedes exhausted his administrative remedies by filing a timely EEOC claim, which was investigated and denied, and then seeking reconsideration, which also was denied. See Doc. No. 1 at ¶¶ 8-9; Doc. No. 35 at 2.

4

opportunities to review performance evaluations; and 3) various forms of retaliation for his previous claims of discrimination. Id.; see Doc. No. 37 at 2-4.

A.  Reassignments

Although he alleges he was reassigned "three times within five months," Doc. No. 1 at ¶ 11, Mercedes describes the circumstances of only one reassignment – from perimeter patrol to the control center for one shift on April 24, 2010, id. at ¶ 12; Doc. No. 35-1 at 3. According to Mercedes, he was reassigned without advance notice, "had not been trained to work" in the control center, and lacked a necessary security password to enter information in the control center's computer system. Doc. No. 1 at ¶¶ 12-13. He claims the reassignment decision was made on April 18, 2010, providing his superiors with sufficient time to notify him of the decision and train him for the control center post, neither of which they did. Id. at ¶ 19.

Mercedes claims he raised these concerns to a supervisor at the time of the reassignment, and the supervisor responded by threatening "to make [Mercedes's] life miserable." Id. at ¶¶ 14-15. Mercedes avers that, in the reassigned post, he would have been held accountable for all errors in security or accounting for inmates during his shift; however, he does not allege that any such errors occurred or that he was "held responsible" in any way. Id. at ¶ 17. The lack of notice or training for the reassignment, says Mercedes, "gives a strong inference" of discrimination "because of [his] race, color, and national origin." Id. at ¶ 23. In addition, Mercedes notes an instance in which a white corrections officer at FMC Devens was "accommodated" by being counseled regarding how he should use "street time" to retrieve a

5

loaded weapon he had left at a hospital. Id. at ¶ 24.[5]

Various individuals who gave statements during the EEOC investigation of Mercedes's complaint stated that supervisors at FMC Devens are permitted to reassign individual corrections officers as needed, although some noted "courtesy calls" about reassignments are "normal." See, e.g., Doc. No. 35-1 at 6 (summarizing statements of Union President and Human Resources Manager). Several individuals also stated that a person with Mercedes's rank should be able to work any post at the prison, see, e.g., id. (summarizing statement of Union President), and that a second officer assigned to the control center with Mercedes on the date of his reassignment had the codes necessary to use the relevant computer programs, see, e.g., id. at 4 (summarizing statement of the second officer).

B.  Evaluations

Mercedes claims he was denied "the opportunity to review his quarterly evaluations and annual evaluation in a timely manner," thus preventing him from questioning their contents or deciding whether or not he wished to sign them. Doc. No. 1 at ¶ 26. Moreover, he alleges, one supervisor noted on several evaluations that Mercedes had refused to sign, despite the fact that Mercedes "had not been asked to sign or refuse to sign them." Id. at ¶¶ 27-29. These evaluations "show[ed] a decrease in [Mercedes's] ratings" and failed to reflect positive comments about his job performance. Id. at ¶¶ 31-32. Mercedes suggests these "falsified"

---

[5]In his brief opposing the Attorney General's motion, Mercedes states he "was told later that a White Officer complained that he did not want to be reassigned to the Control post and he was accommodated to another post." Doc. No. 37 at 9. This assertion appears nowhere in the complaint, nor is it included in the affidavit submitted by Mercedes along with his brief. Accordingly, the Court will disregard it. Mercedes may not escape judgment on the pleadings via an allegation made for the first and only time in his memorandum of law.

evaluations in his personnel file are "viewed for awards, promotions, transfers to another institution, and/or other employment opportunities," id. at ¶ 37, but he does not identify any such opportunities he claims to have lost as a result of the evaluations.

After Mercedes raised the issue regarding his evaluations with his superiors, the supervisor who had completed the evaluations and wrongly noted Mercedes's refusal to sign them was reprimanded for not following relevant policies about performance evaluations. Doc. No. 35-1 at 11 (summarizing statement of Captain who placed "counseling letter" in supervisor's file). According to Mercedes, this reprimand "minimiz[ed] the discriminatory act" and "condoned falsifying Federal Documents." Doc. No. 1 at ¶¶ 38-39. Mercedes claims all of this occurred "because [he] is a Black Hispanic from the Dominican Republic." Id. at ¶ 39. Other individuals interviewed in connection with Mercedes's EEOC complaint, however, stated the same supervisor had used the same improper methods for all performance evaluations over a period of time, including those of other employees as well.[6] Doc. No. 35-1 at 8, 10 (summarizing statements of Mercedes's direct supervisor and the supervisor who wrote the relevant evaluations).

C. Other Retaliatory Actions

Mercedes filed multiple EEOC complaints during his time at FMC Devens, including some that predated the claims in this action.[7] Doc. No. 1 at ¶¶ 40, 43-44. He claims he "has

---

[6]The supervisor's practice was to email copies of evaluations to individuals, place the onus on them to make arrangements to meet with him to review and discuss them, monitor whether they had opened and read his email to them, and then deem their subsequent failure to contact him about the evaluation a "refusal to sign." Doc. No. 35-1 at 10.

[7]The first complaint was filed in January 2007. Doc. No. 1 at ¶ 43. Mercedes alleges he filed other complaints as well, but does not specify when he did so or how such complaints were

7

been 'black-listed' by the administration" for filing such complaints, and that "his co-workers are afraid to assert their legal rights" as a result. Id. at ¶ 46. To support his claim of retaliation, Mercedes identifies the following actions: 1) a prison administrator's statement during the EEOC investigation characterizing Mercedes as "paranoid," id. at ¶ 47;[8] 2) the alleged failure of union representatives to "assert . . . employee[s'] rights as they should," including documenting a meeting sought by Mercedes regarding his reassignment on April 24, 2010 with a memorandum concluding that no violation had occurred, id. at ¶¶ 48-49;[9] 3) denial of a promotion in 2009, id. at ¶ 50;[10] 4) being "supposedly randomly chosen for a drug test" in 2009, id.; 5) being "told [in 2009] that he was overdue for his 5 year background check though his last one was [more than

---

resolved. See id. at ¶ 44 (referencing "[a]ll" of his complaints); Doc. No. 37 at 11 (mentioning a June 2009 complaint and subsequent appeal thereof related to a promotion Mercedes had been denied). It is unclear whether Mercedes claims one or all of these previous complaints allegedly animated the retaliatory conduct he describes here. Mercedes does not allege facts describing the substance or resolution of the previous complaints.

In an affidavit submitted with his opposition brief, Mercedes claims he "won" this first complaint, with a finding "that FMC Devens did discriminate against [him] and [create] a hostile work environment." Doc. No. 37-2 at ¶ 6. He asserts that he continued to suffer discrimination and retaliation thereafter because no one was disciplined despite the success of his first complaint. Id. These facts are not included in the complaint, nor does Mercedes provide any details about the underlying claims in that first administrative action. An absence of negative consequences for Mercedes's alleged harassers seems to undermine a claim that his previous "win" was the impetus for retaliation against him (though it might explain why the alleged harassment did not cease).

[8]In the EEOC investigation report that is before the Court, this administrator stated he was not aware of the prior EEOC complaints which Mercedes alleges were the cause of the alleged retaliation. Doc. No. 35-1 at 11.

[9]The union representative's statement to EEOC investigators conveyed his belief that Mercedes was not treated differently than other staff, and was not subject to discrimination based on race or national origin. Doc. No. 35-1 at 5.

[10]Mercedes apparently has received the promotion he previously was denied. See Doc. No. 37 at 11 (stating he was promoted to his current rank "on his fourth attempt," and after filing an EEOC complaint about his prior denials).

ten years earlier]," id.; 6) being investigated in 2009 for failing to follow instructions, a claim that was deemed "unsubstantiated," id.;[11] 7) receiving lower ratings on an evaluation in 2009 based on his refusal to act as a Spanish-English translator, a task which "is not part of his duties," id.; and 8) having his role in preventing bodily harm to another staff member overlooked in a 2009 email about the incident, id. All of this, he summarily claims, constituted "reprisal" for his EEOC activity. Id.

III.   DISCUSSION

The Attorney General seeks judgment on the pleadings as to each of the three claims set forth in Mercedes's complaint. He argues Mercedes has alleged no discriminatory acts, no events sufficient to constitute a hostile work environment, and no adverse employment actions that arose from any protected activity under Title VII. See generally Doc. No. 35. Mercedes contends that his reassignment to the control center and the failure to allow him to review his evaluations were discriminatory acts, that the same two actions created a hostile work environment, and that his remaining allegations demonstrate various forms of retaliation. See generally Doc. No. 37. Neither the pleadings nor the law support Mercedes's view.

A.   Discrimination

As a matter of law, neither of the events Mercedes has identified as the basis for his discrimination claim constitute adverse employment actions for Title VII purposes.

Mercedes has not alleged sufficient facts to conclude that his temporary reassignment from perimeter patrol to the control center is reasonably viewed as a "materially adverse change

---

[11] The complaint contains no additional allegations about the nature of this claim or the related investigation, nor is it discussed in Mercedes's brief.

9

in the terms and conditions of employment," Morales-Vallellanes, 605 F.3d at 35, or that it amounted to something "more disruptive than a mere inconvenience or an alteration of job responsibilities," Marrero, 304 F.3d at 23. The reassignment was limited to a single shift on one day. At the time, Mercedes was a federal corrections officer with more than a decade of experience, including nearly five years at FMC Devens. He apparently had worked in a control center at another institution, and working that post at FMC Devens was within his job responsibilities, given his years of experience and his rank. See Doc. No. 35-1 at 7, 12 (summarizing statements of Mercedes's direct supervisor and the Associate Warden); Doc. No. 37 at 5-6 (admitting Mercedes had previous control center experience in New York, but suggesting "there are major differences" between the two institutions).[12] Besides lacking a necessary computer code – which a coworker assigned to the control center with him for much of the same shift did possess[13] – Mercedes has not identified any aspect of the assignment for which he was unprepared. Moreover, he has not alleged that he caused or was blamed for any

---

[12]Mercedes's brief is replete with information not contained in the pleadings or the EEOC documents incorporated therein and presented to the Court. For example, the brief characterizes differences between the control centers at Mercedes's prior institution and FMC Devens, and also conveys Mercedes's understanding of how reassignments are supposed to occur. See Doc. No. 37 at 5-6. In addition, Mercedes cites to portions of the apparently voluminous EEOC record without providing them to the Court. See, e.g., Doc. No. 37 at 6-7, Ex. A (citing various exhibits to the "ROI," but attaching only a table of contents thereto). Even if these facts were properly before the Court for consideration, they do not transform Mercedes's reassignment into an adverse employment action for Title VII purposes under the circumstances presented here.

[13]Mercedes alleges the coworker with the code was, at some point, relieved by another officer who did not have the code, and that an inmate's subsequent return to the facility could not be documented properly as a result. Doc. No. 1 at ¶ 20. He explains, however, that he notified a superior of this event when it occurred and was told that an officer on the next shift would complete the necessary computer entry. Id. Although he suggests this was not in keeping with prison policy, id., he does not assert that he was reprimanded or that any other harm flowed from this event.

errors during the relevant shift. Under these circumstances, his reassignment does not constitute an adverse employment action. Cf. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (finding five-month reassignment was an adverse employment action where plaintiff was deprived of meaningful duties and expected to perform work "for which he had no background").

The alleged denial of opportunities to review and sign performance evaluations cannot save Mercedes's discrimination claim. The evaluations themselves are not equivalent to actions like "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998). Although he notes that employment decisions are made on the basis of the contents of officers' personnel files, Mercedes does not claim any adverse decisions were made regarding his own employment as a result of the evaluations about which he complains.

Taking all of the facts alleged by Mercedes in his complaint as true, neither of the events he has identified constitute "adverse employment actions." As such, Mercedes has failed to plead any discrete acts that justify permitting his discrimination claim to proceed any further.[14]

B.  Hostile Work Environment

---

[14]The Court notes that even if there were legal support for viewing these actions as adverse for Title VII purposes, Mercedes has offered nothing more than a bare conclusion that the actions were motivated by his race or national origin. The mere fact that Mercedes is a Black Hispanic from the Dominican Republic, without any additional allegation to suggest that his status as such was the basis for his single-shift reassignment or his supervisor's failure to properly review evaluations with him, does not justify an inference of discrimination or transform such decisions into actionable instances of discrimination. See Ahmed v. Johnson, No. 13-1054, 2014 WL 2111236, at *3-4 (1st Cir. May 21, 2014) (discussing circumstantial evidence of discrimination and prima facie case necessary to raise an inference of discrimination).

11

Similarly, Mercedes's allegations do not approach the sort of "severe or pervasive" and objectively offensive conduct necessary to create a hostile work environment. Mercedes rests his hostile work environment claim on the same two actions discussed in the preceding section – his one-time reassignment to the control center, and the denial of an opportunity to review certain performance evaluations. Doc. No. 37 at 8-9. As the Attorney General argues in his brief, there are several flaws in Mercedes's pleading of this claim.

Perhaps most notably, Mercedes has alleged no facts that would support an inference, even at this early stage in the proceedings, that either action resulted from his race or national origin. Because "Title VII does not prohibit all verbal or physical harassment in the workplace," Mercedes must allege sufficient facts to demonstrate that the hostility of which he complains was linked to his race or national origin. <u>Oncale</u>, 523 U.S. at 80. His conclusory claims that these characteristics motivated his temporary reassignment to a post within his responsibilities as a Senior Officer Specialist and the denial of a chance to review his evaluations cannot support a viable hostile work environment claim. <u>See</u> <u>Bell Atl. Corp.</u> 550 U.S. at 555 (requiring more than labels and conclusions). The mere failure of his superiors to notify him in advance of the reassignment – even if such "courtesy calls" are often provided – simply is not sufficient to justify an inference that Mercedes's race or national origin was central to the complained-of conduct.

Furthermore, neither event identified by Mercedes is "objectively offensive," nor do the events in combination amount to a "severe or pervasive" work environment. Mercedes has not alleged the sort of hostile or abusive conduct that a reasonable person working at FMC Devens would find offensive – indeed, it is difficult to imagine any reasonable employee viewing the

12

one-day reassignment or the relevant supervisor's erroneous evaluation practices alleged by Mercedes as actionable harassment based on race or national origin. See Douglas v. J.C. Penney Co., 474 F.3d 10, 15 (1st Cir. 2007) (finding no prima facie hostile work environment claim where performance evaluation irregularities were not objectively offensive). Similarly, the conduct Mercedes alleges amounts to isolated events that were not severe, pervasive, or "so egregious as to evince a hostile work environment." Ponte v. Steelcase Inc., 741 F.3d 310, 320 (1st Cir. 2014); cf. Oncale, 523 U.S. at 77 (finding overtly "sex-related, humiliating actions" against the plaintiff, including threats of rape, to be sufficiently egregious).

Where, as here, "a workplace objectively falls short of th[e] 'abusive' high-water-mark, it cannot sustain a hostile-work-environment claim." Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 74 (1st Cir. 2011); see Faragher, 524 U.S. at 788 (noting "conduct must be extreme to amount to a change in the terms and conditions of employment").[15]

C. Retaliation

Finally, Mercedes has not alleged any materially adverse action taken against him in response to his previous EEOC complaints, as he must to sustain a Title VII retaliation claim. Although he presents a litany of events "he feels were reprisal for EEO activity and not mere coincidences," Doc. No. 1 at ¶ 50, the complaint includes no facts to support this conclusory

---

[15] This would be so even if the additional conduct incorporated into Mercedes's retaliation claim were considered in connection with his hostile work environment claim (despite the fact that he has not supported this claim with those alleged acts). Mercedes alleges nothing in the complaint that would connect any of that additional conduct – e.g., selecting him for a drug test and a background check – to his race or national origin. Although courts may consider harassing conduct that is not overtly discriminatory in nature, O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001), there still must be sufficient allegations linking the overall pattern of alleged abuse to one of the protected characteristics that are the focus of Title VII.

statement of Mercedes's personal belief. He does not allege which individuals were responsible for the conduct he describes or whether they knew of or were involved in his prior complaints. He describes very little about the chronology of the previous complaints and the alleged conduct. See Doc. No. 1 at ¶¶ 43-44, 50 (stating his "first" complaint was in early 2007, referencing an unspecified number of subsequent complaints at unspecified times, and listing numerous allegedly retaliatory events "in 2009"). Indeed, he presents no facts to support a causal connection between his previous complaints (which he does not describe at all) and the conduct (which he does not describe with any specificity). Cf. Mesnick v. Gen. Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991) (finding timeline suggested no causal connection between EEOC complaints and plaintiff's termination nine months later where no other evidence of retaliatory animus or acts in the intervening time was presented).

Moreover, much of the allegedly retaliatory conduct is not, as a matter of law, "materially adverse" because it would not "dissuade a reasonable worker from making or supporting a charge of discrimination." Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006). For example, Mercedes has not alleged facts which suggest his selection for random drug testing or a background check for which he was admittedly overdue were anything more than "minor annoyances that often take place at work and that all employees experience." Id. at 68. The same is true of his allegations regarding the omission of his name from an email about the prevention of harm to a fellow staff member, his receipt of lower performance ratings based on his refusal to act as a translator between Spanish-speaking inmates and English-speaking staff, a union officer's determination in a memorandum that Mercedes's reassignment

had not violated prison policy, an administrator's description of Mercedes as "paranoid,"[16] and the investigation of Mercedes for an alleged violation that was deemed unsubstantiated.

Although the denial of a promotion could constitute a materially adverse action in the mind of a reasonable person, Mercedes has offered no facts to suggest a connection between that denial and any previous EEOC complaint. In fact, his briefing suggests he ultimately received the promotion after filing an EEOC complaint. See Doc. No. 37 at 11 (noting Mercedes filed a complaint after his third non-promotion in June 2009, filed a related appeal in January 2010, and had received the promotion sometime before the April 2010 reassignment). Under these circumstances, he has not stated a prima facie case of retaliation.

IV. CONCLUSION

Because Mercedes has offered little more than "labels and conclusions" in support of his discrimination and retaliation claims, Bell Atl. Corp., 550 U.S. at 555, the Attorney General's motion for judgment on the pleadings is ALLOWED. A separate judgment in favor of the Attorney General will follow.

SO ORDERED.

/s/ Leo T. Sorokin
Leo T. Sorokin
U.S. District Judge

---

[16]Mercedes notes another supervisor told EEOC investigators that Mercedes files complaints "when [he] does not get what he wants." Doc. No. 35-1 at 9. He claims such comments are efforts "to discredit and minimize [his] credibility among his co-workers . . . and minimize the EEOC process." Doc. No. 37 at 11. His complaint does not allege, however, that his co-workers were aware of the comments made to EEOC investigators or that the EEOC process was impeded by such comments.